UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION NO. 10-289-GWU


GREGORY EVAN ROSE,                                                    PLAINTIFF,


VS.                          **MEMORANDUM OPINION**


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                      DEFENDANT.


## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of his applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI).  The appeal is currently before the court on cross-motions

for summary judgment.


## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation

process in assessing whether a claimant is disabled.

1.    Is the claimant currently engaged in substantial gainful activity?
      If so, the claimant is not disabled and the claim is denied.

2.    If the claimant is not currently engaged in substantial gainful
      activity, does he have any "severe" impairment or combination
      of impairments--i.e., any impairments significantly limiting his
      physical or mental ability to do basic work activities?  If not, a
      finding of non-disability is made and the claim is denied.

1

3.     The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.     At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.     If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence.  Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

2

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform,

3

then an award of benefits may, under certain circumstances, be had.  E.g.,  Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions  .  .  .  or  heightened  sensitivity  to  environmental

4

contaminants . . . rote application of the grid [guidelines] is inappropriate . . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Id. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Gregory Evan Rose, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of a history of stroke, alcohol dependence, and seizures.  (Tr. 13).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that the plaintiff retained the residual functional capacity to perform his past relevant work as a night watchman, and terminated the sequential evaluation process at Step Four.  (Tr. 15-20).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age of 44, high school education, and work experience as a night watchman and self-employed contractor could perform any jobs if he were capable of lifting 50 pounds occasionally and 20 pounds frequently, and also had the following non-exertional characteristics.  He: (1) could not climb ladders, ropes, or scaffolds; (2) could frequently climb ramps and stairs; (3) needed to avoid exposure to hazardous machinery and heights; and (4) would have moderate to marked limitations in his ability to understand, remember, and carry out detailed instructions and respond appropriately to changes in the work setting.  (Tr. 49).  The ALJ also specified that the individual would have the ability to perform the basic mental demands of unskilled work, including the ability to understand, remember, and carry out simple instructions, make judgments commensurate with the functions of unskilled work, respond appropriately to supervisors, coworkers, and work situations, and deal with changes in a routine work setting.  (Id.).  The VE responded that such a person could perform the plaintiff's past work as a night watchman, although he could not work as a contractor.  (Id.).  In the alternative, the VE named other jobs that the person could perform, and proceeded to give the numbers in which they existed in the state and national economies.  (Tr. 50-1).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

Mr. Rose alleged disability due to high blood pressure and a stroke in April, 2007, which had left him with double vision, numbness on the left side of his body, trouble grasping objects, minor memory loss, and headaches.  (Tr. 154).  At the administrative hearing, he said that his "stroke" was more accurately described as a "cerebral hemorrhage."  (Tr. 30).  Currently, he was still having what he described as "staring spells" five to six times a day, and despite evaluation by neurologists at the University of Kentucky Medical Center (UKMC), no cause for the spells had been found.  (Tr. 32-4).  Despite the spells, he continued to drive two to three times a week, and had driven to the administrative hearing.  (Tr. 27, 35, 42).  Mr. Rose admitted that he had lost his license at one point due to DUI citations, and although he claimed he was no longer drinking, stated that he would still drink once or twice a week, consuming up to six beers at a time.  (Tr. 30-1).  Other problems included forgetfulness and headaches five to six times per day.  (Tr. 42).  He was also performing part-time work at a local bank branch doing maintenance, making approximately $100.00 per month.  (Tr. 28).  He described his duties as picking up trash, trimming shrubs, mowing, and changing light bulbs.  (Tr. 39-40).  When he was not working, he occupied his time taking care of his 17-acre property, including

mowing it with a riding mower, tending a 50 by 100 foot garden, doing maintenance on his car, occasionally visiting, and performing repair of wooden objects.  (Tr. 36-8).  He went grocery shopping, and could take care of his personal needs, and would split the household chores with his wife, who was disabled.  (Tr. 39).  However, he felt that he was not able to work for more than an hour without becoming fatigued and having to rest.  (Tr. 43).

Medical evidence in the transcript shows a hospital admission at UKMC in April, 2007 for what was diagnosed as a subarachnoid hemorrhage and cranial nerve IV palsy.  (Tr. 291).  A CT scan had shown the subarachnoid hemorrhage (Tr. 277) but a cerebral angiogram was negative for any aneurysm, and his blood pressure was well controlled with medications.  (Tr. 292, 301-2).  There were also repeated negative transcranial Doppler studies.  Mr. Rose's hospital course was uneventful, although he maintained cranial nerve palsy with "minimal" ptosis on the right and a headache, which was controlled with medication.  (Tr. 292).  He was discharged home with a regular diet and activity as tolerated.  (Id.).

On follow-up in June, 2007, Dr. Robert Owen, an assistant professor of neurosurgery at UKMC, noted that Mr. Rose looked quite well, his face was symmetric, sensation and strength were normal, reflexes were equal, and his gait was unremarkable.  (Tr. 329).  On July 30, 2007, although Mr. Rose still complained of headaches and some memory loss, his examination was still normal, and a

CT/angiogram did not show any aneurysm or other changes.  (Tr. 328, 418).  Dr. Owen concluded that surgical intervention was not warranted and there was a good chance his symptoms would clear in the months to come, although he suggested that a neurologist should evaluate his headaches and memory problems.  (Id.).

Further evaluations by various neurologists at UKMC included an unremarkable MRI of the head, and a normal EEG.  (Tr. 338-9, 342, 431-20).  His physical examinations were essentially normal.  He admitted that he continued to drink five to six beers per day.  (Tr. 342, 431).  Nevertheless, Mr. Rose was evaluated at the UKMC Epilepsy Monitoring Unit in April, 2008.  He reported having four of his typical spells during the evaluation, but the EEG did not show any change from his baseline background activity, and it was concluded that his episodes were most likely non-epileptic.  (Tr. 389, 429).  The neurologist, Dr. Meriem Bensalam Owen, suggested that the episodes could be psychogenic in origin or simply represent daydreaming.  (Id.).  She encouraged him to see a psychiatrist or counselor for depression.

On follow-up with UK Neurology, the plaintiff stated that he had not increased his dosage of the medication Depakote as prescribed because of cost, although at a low dose it helped his headaches.  His staring spells were continuing.  (Tr. 427).  He continued to smoke one pack of cigarettes a day, drink approximately six beers a day, and have two to three cups of coffee.  (Id.).  Other than appearing slightly

depressed, the examination was normal.  Later in the year, he was taken off of Depakote because of his daughter's report that he was confused and disoriented on the medication, and had recently fallen down after standing up suddenly.  The physician referred Mr. Rose to a Dr. Tucker for evaluation of his headaches.  (Tr. 425).[1]  No functional restrictions are given by any of the UK sources.

Dr. Stephen Nutter conducted a consultative evaluation of the plaintiff on December 17, 2007.  (Tr. 333).  Dr. Nutter's examination showed an elevated blood pressure, but he noted that the plaintiff's recent and remote memory for medical events was good, he had a normal gait, normal muscle strength, intact sensations and normal lower extremity reflexes.  His grip was less on the left than on the right, but rated as normal.  He could walk on his heels and toes, perform a tandem gait, and squat, but did have slight difficulty balancing with the tandem gait.  (Tr. 335).  There was also some tenderness of the lumbar spine.  No functional restrictions are suggested.

Non-examining state agency physicians reviewed the record in April and July, 2008 and concluded that the plaintiff could perform physical activities consistent with the ALJ's hypothetical question.  (Tr. 373-80, 409-15).

-------

[1]The plaintiff stated at the hearing that he had seen Dr. Tucker approximately two weeks ago and she had started him on new medications.  (Tr. 43).  There are no records from this source.

The only evidence of greater physical restriction comes in the report of Michael W. Myers, a registered nurse-practitioner, who limited the plaintiff to less than full-time work.  (Tr. 436-7).  It appears that Myers was employed in the office of Dr. Gregory Santos, the plaintiff's treating family physician.  (Tr. 441-2, 446).  The ALJ rejected these restrictions because they were not supported by the medical record.  (Tr. 19).  The plaintiff objects to the rejection of what he describes as a treating source opinion, but a nurse-practitioner is not considered an acceptable medical source under the applicable regulations.  20 C.F.R. §§ 404.1513(d); 416.913(d).  Accordingly, the physical factors in the hypothetical question are supported by substantial evidence.

From a mental standpoint, no treating source gave an opinion.  Mr. Rose was evaluated by Marthanne Manion, a certified psychologist with autonomous functioning, in January, 2008.  She noted that he smelled of alcohol, admitted that he had twelve beers the day before the examination, and stated that he usually consumed six beers once or twice a week.  (Tr. 343, 347).  The psychologist reviewed some of the UK Neurology records.  (Tr. 344).  Mr. Rose described being forgetful and having difficulty processing information.  (Id.).  He had frequent headaches, although Depakote would "take the edge off."  He stated that he had sought treatment of anxiety, irritability, and depression about three months earlier at the suggestion of his family doctor, and was on the medications Zoloft and

Klonapin, which were helping.  (Tr. 345).[2]  He testified that he could perform daily activities such as meal preparation, mailing, and paying bills if he paid attention.  (Tr. 345-6).  Testing showed a full scale IQ of 79 and an eighth grade reading ability with no evidence of malingering, but the psychologist felt that the results most likely represented a decline in his cognitive functioning.  (Tr. 348-9).  She diagnosed a cognitive disorder secondary to a stroke, depression, and alcohol abuse, and opined that Mr. Rose would have a severely impaired ability to tolerate stress and pressure of day-to-day work activity and a markedly impaired ability to understand, remember, and follow detailed or complex instructions, maintain attention and concentration, and carry out and persist at simple, repetitive tasks without special supervision.  (Tr. 351).  She did not attempt to describe Mr. Rose's limitations in the absence of alcohol abuse.

State agency psychological reviewers declined to give significant weight to the examiner's opinion, citing the fact that Mr. Rose smelled of alcohol, the fact that his memory was adequate in spite of reports to the contrary, and because of his daily activities.  They provided limitations that were largely consistent with the hypothetical question.  (Tr. 364-7, 390-2).

The plaintiff objects to the ALJ's determination that he would give significant weight to some parts of Manion's opinion but not others (Tr. 18), accusing the ALJ

---

[2]At the hearing, Mr. Rose denied any mental health treatment.  (Tr. 35).

of unsupported, quasi-medical speculation.   However, the ALJ gave specific reasons for his departures, noting his daily activities clearly demonstrated a higher level of functioning and ability to concentrate.  (Id.).   The plaintiff assigns this as representing "sit and squirm" decision making, saying that the ability to replace light bulbs and use a riding lawn mower should not be given greater weight than "compelling medical evidence."[3]   While the undersigned agrees that minor daily activities such as watching television and preparing simple meals are not very convincing evidence of an ability to perform full-time work, the plaintiff's admitted activities in this particular case go far beyond these limited actions, as described above.  Even leaving aside his part-time job, which the ALJ found did not represent substantial gainful activity, Mr. Rose's daily chores appear to represent a fairly active lifestyle.  As the ALJ noted, taking care of a 50 by 100 foot garden is a substantial amount of work.  (Tr. 19).  Even if this were not fatal to the plaintiff's claims, there is a lack of "compelling medical evidence" of physical restrictions from treating and examining sources.  Ultimately, the plaintiff simply failed to prove that he has greater restrictions than found by the ALJ.

The plaintiff also suggests that there was potentially relevant evidence missing from the transcript, in light of the plaintiff's testimony that he received SSI

---

[3]"Sit and squirm" decision making traditionally refers to an ALJ finding a claimant less than credible because of a perceived lack of pain behavior at the administrative hearing, rather than contrasting the plaintiff's daily activities with his alleged limitations.

benefits for four months and did not know why he had been cut off.  (Tr. 44).  The defendant has provided a declaration by an employee of the Social Security Administration Regional Office, which states that Mr. Rose received presumptive disability payments on his claim between January and April, 2008.  Declaration of Patricia MacInnis, Docket Entry No. 15-1.  She noted that presumptive disability payments are stopped when an unfavorable decision is reached, and Mr. Rose's payments were terminated after the initial denial of his claim on April 3, 2008.  Id. Therefore, it does not appear that there is any evidence missing from the record which would aid the plaintiff's case.

The decision will be affirmed.

This the 18th day of May, 2011.

Signed By:

G. Wix Unthank

United States Senior Judge